**Joseph FRANZA**

**v.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS AND HELPERS OF AMERICA, LOCAL 671; and Thomas Robidoux.**

**Civ. No. H–86–625(AHN).**

United States District Court,
D. Connecticut.

Jan. 21, 1988.

sure Act (the "LMRDA" or "Act"), 29 U.S. C. Section 401 *et seq.*, lost his job as an auditor with the Health Services Plan of Truck Drivers Union, Local 671 ("the Plan"). Franza alleges that he was wrongfully terminated by the defendant Thomas Robidoux, the newly-elected secretary-treasurer of the defendant International Brotherhood of Teamsters, Chaffeurs and Helpers of America, Local 671 ("Local 671" or the "Union"), in retaliation for Franza's support of the losing candidate, incumbent Richard Robidoux, in a Union election won by Thomas Robidoux.

On October 19 to 21, 1987, the jury heard evidence on the liability aspects of this bifurcated case. At the conclusion of its charge, the court submitted six special interrogatories to the jury, pursuant to Rule 49(a), Fed.R.Civ.P., to aid it in its deliberations. The jury answered Special Interrogatory No. 1 in the affirmative and the remaining five in the negative. Special Interrogatory No. 1 reads: "Has the plaintiff Joseph Franza met his burden of proving, by a preponderance of the evidence, that Thomas Robidoux retaliated against him because the plaintiff supported Richard Robidoux in his re-election campaign?" [1]

Thomas Robidoux argues that as a matter of law, and the affirmative answer to the special interrogatory notwithstanding, Franza has failed to establish that the LMRDA can afford him relief. After reviewing the litigants' memoranda of law on this issue and hearing oral argument on the matter, the court agrees with the defendant Thomas Robidoux and finds that the plaintiff has no cause of action under the LMRDA.[2]

Leon Rosenblatt, Clayman, Markowitz & Litman, Bloomfield, Conn., for plaintiff.

Gregg Adler, Kestell, Pogue & Gould, Hartford, Conn., for defendants.

## RULING RE JURY'S AFFIRMATIVE ANSWER TO SPECIAL INTERROGATORY NO. 1

NEVAS, District Judge.

In December 1985, Joseph Franza, the plaintiff in this jury case brought under the Labor–Management Reporting and Disclo-

I.

The Plan administers several welfare and insurance programs on behalf of Local 671's members but is an entity entirely separate from the Union. The plaintiff, the only Union member employed by the Plan,

---

1. Special Interrogatory No. 2 is worded in the same fashion, except that it was directed at the defendant Union. See *infra* note 7 for a summary of the contents of Special Interrogatories Nos. 3 through 6.

2. Ironically, the trial in this case was unnecessary: The matter could have been resolved in the defendants' favor on a Rule 12(b)(6) or Rule 56, Fed.R.Civ.P., motion because the dispositive facts were never in dispute. The defendants did not file such pretrial motions, preferring instead to raise the issues for the first time during trial.

openly campaigned for the slate led by Richard Robidoux in the 1985 Union election. When Thomas Robidoux won the election and succeeded Richard Robidoux as secretary-treasurer of Local 671, Thomas Robidoux also became chairperson of the Plan's Board of Trustees ("Board"). According to the plaintiff, the defendants had him dismissed by the Board in order to discipline and punish him for exercising rights protected by the LMRDA. The plaintiff also alleges that his termination was part of a pattern of conduct by the defendants to purge opponents of Thomas Robidoux. Franza's severance from his Plan employment in no way affected his status or rights as a member of Local 671. Franza seeks reinstatement, compensatory and punitive damages, attorneys' fees, and costs.

In their counterclaim, the defendants allege that Franza was hired as a Plan employee in 1981 by Richard Robidoux even though the plaintiff lacked the qualifications to be an auditor. According to the defendants, Franza was employed so that he could perform personal services, not related to Plan work, for Richard Robidoux. The defendants allege that the salary and perquisites received by Franza were in violation of the governing provisions of the Plan and that Thomas Robidoux, as a fiduciary of the Plan, thus had a duty to dismiss the plaintiff under the strictures of the Employment Retirement Income Security Act, 29 U.S.C. Section 1001 *et seq.* In addition to attorneys' fees and costs, the defendants seek from Franza restoration to the Plan of all losses attributable to Richard Robidoux's breaches of fiduciary duty and the voiding of any employment agreements made between the plaintiff and Richard Robidoux.

## II.

The LMRDA, popularly known as the Landrum–Griffin Act, was originally drafted as labor reform legislation aimed at union abuses in internal elections and accounting procedures. The Act, passed by Congress in 1959, was designed to ensure that "union practices and procedures be democratic and that they recognize and protect the basic rights of the union members and the employees represented by unions." *Murphy v. International Union of Operating Engineers, Local 18,* 774 F.2d 114, 121 (6th Cir.1985), *quoting* H.R.Rep. No. 741, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad.News 2318, 2429. *See generally* Atleson, *A Union Member's Right of Free Speech and Assembly: Institutional Interests and Individual Rights,* 51 Minn.L.Rev. 403 (1967) ("Atleson"). Title I of the LMRDA, 29 U.S.C. Section 411 *et seq.,* is captioned "Bill of Rights of Members of Labor Organizations"; its purpose is to promote union democracy by protecting union members' free speech and participation in political activities. Beaird & Player, *Free Speech and the Landrum–Griffin Act,* 25 Ala.L. Rev. 577, 580 (1973) ("Beaird & Player"). Title I was a hastily drafted amendment to the LMRDA introduced during debate on the Senate floor. When enacted it contained ambiguities that have spawned substantial litigation and disparate interpretations. Atleson, 51 Minn.L.Rev. at 408. In addition to inexact drafting and sparse legislative history, the phrasing of Title I reflects a compromise between two competing policies: congressional concern for increased union democracy and congressional reluctance to interfere with internal union affairs. Beaird & Player, 25 Ala.L.Rev. at 579.

The plaintiff sued Local 671 and Thomas Robidoux under sections 101(a)(1), (2), (5), and 102 of Title I. Section 101(a)(1), 29 U.S.C. Section 411(a)(1), states:

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

Section 101(a)(2), 29 U.S.C. Section 411(a)(2), provides:

Every member of any labor organization shall have the right to meet and assemble freely with other members;

and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Though section 101(a)(2) guarantees union members a free speech right, it also allows a union to regulate that right when union rules are "reasonably related to the protection of the organization as an institution." *United Steelworkers v. Sadlowski*, 457 U.S. 102, 112, 102 S.Ct. 2339, 2346, 72 L.Ed. 2d 707 (1982). Such rules, furthermore, receive less scrutiny than governmental regulations in first amendment cases. *Id.* at 111, 102 S.Ct. at 2345.

Section 101(a)(5), 29 U.S.C. Section 411(a)(5), provides:

No member of any labor organization may be fined, suspended, expelled or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

Section 102, 29 U.S.C. Section 412, the jurisdictional provision of Title I, states in relevant part: "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief ... as may be appropriate." Franza alleges that his firing as an auditor of the Plan was an "infringe[ment]," within the meaning of section 102, of rights granted him by sections 101(a)(1) and (2). He also alleges that he was "otherwise disciplined" within the meaning of section 101(a)(5).[3]

### III.

The issue before the court is whether a cause of action lies under Title I for a union member who is dismissed from non-union employment because of actions taken by a union official who is also a trustee of the non-union entity employing the union member. The plaintiff argues that Title I encompasses a cause of action for such facts; the defendants[4] contend that no cause of action lies because the plaintiff's membership rights in Local 671 were not adversely affected by any actions taken by Thomas Robidoux. While opposing counsel have been unable to cite a case directly on point—and the court after diligent effort has been unable to find such authority— the parties rely to a great degree on the same cases for the foundations of their arguments. Counsel merely differ in their interpretations of those cases.

The court's analysis must begin with *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the Court's most analogous case to the issue raised in the present proceedings. In *Finnegan*, the Court held that Title I does not prohibit a newly-elected union leader from ousting appointed union officials who supported the losing candidate in an intra-union election. *Id.* at 441, 102 S.Ct. at 1873. The discharged officials were business agents who had been appointed by the defeated incumbent; all of the dischargees retained their

---

**3.** The court ruled on the plaintiff's section 101(a)(5) claim before the six special interrogatories were submitted to the jury. *See infra* note 5.

**4.** Though the jury found that the Union had not retaliated against the plaintiff, Franza argues that an agency relationship exists between Thomas Robidoux and Local 671 making the Union liable for the actions of its principal officer. Plaintiff's Trial Brief at 11–14. The defendants have not submitted opposition to this argument because the parties were not asked to brief this issue. The court's ruling on the plaintiff's Title I claims disposes of the agency question, in any event, but for ease of reference the court makes no distinction between Thomas Robidoux and the Union unless the context warrants it.

union membership. *Id.* at 433–34, 102 S.Ct. at 1869–70. The former business agents filed suit under sections 101(a)(1), 101(a)(2), 102, and 609 of the LMRDA, alleging that they had been unlawfully terminated from their positions in retaliation for their exercise of rights guaranteed by Title I. 456 U.S. at 434, 102 S.Ct. at 434.

The plaintiffs contended that their dismissals from union employment constituted "discipline" within the meaning of section 609 of the LMRDA. *Id.* at 437, 102 S.Ct. at 1871. Section 609, 29 U.S.C. Section 529, reads in pertinent part: "It shall be unlawful for any labor organization, or any officer ... to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter." The Court determined that section 609's prohibition against discipline

> refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union. Section 609 speaks in terms of disciplining 'members'; and the three disciplinary sanctions specifically enumerated—fine, suspension, and expulsion—are all punitive actions taken against union members as members. In contrast, discharge from union employment does not impinge upon

the incidents of union membership, and affects union members only to the extent that they happen also to be union employees. [citations omitted.]

*Id.* at 437–38, 102 S.Ct. at 1871–72 (emphasis in original). Thus, according to the Court, removal from appointed union office is not "discipline" under section 609 unless the discharged officer's membership rights are abridged.[5]

The Court then conducted a separate analysis of section 102, which, as noted above, is also a jurisdictional predicate for suits alleging Title I violations. Though the Court observed that "the intended relationship between sections 102 and 609 is not entirely clear," it recognized that a plaintiff could maintain a section 102 "infringement" action in the absence of a section 609 action. *Id.* at 439, 102 S.Ct. at 1872. The Court concluded, however, that the *Finnegan* plaintiffs,

> as union members, had a right under sections 101(a)(1) and (2) to campaign ... and to vote in the union election, but they were not prevented from exercising those rights. Rather, petitioners allege only an *indirect* interference with their membership rights, maintaining that they were forced to 'choos[e] between

---

**5.** During the course of the trial a question arose as to the meaning of the word "discipline" in sections 101(a)(5) and 609 and whether the characterization of a particular union action as "discipline" was a question of law or a question of fact. The court asked the parties to submit trial memoranda on the issue, and it heard oral argument on the matter. On the third day of trial, the court issued a bench ruling dismissing Franza's section 101(a)(5) "discipline" claim. The court found that determination of the meaning of the term is a question of law. *Galke v. Duffy*, 645 F.2d 118, 120 (2d Cir.1981) (*citing Morrissey v. National Maritime Union*, 544 F.2d 19, 25–26 (2d Cir.1976)). In fashioning its ruling, the court relied on the Court's holding in *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), that the term "discipline" as used in section 609 of the LMRDA, 29 U.S.C. Section 529, "refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union." 456 U.S. at 437, 102 S.Ct. at 1871 (emphasis in original). It was undisputed that the plaintiff retained all of his Title I membership rights after his discharge as an auditor for the Plan. Though Franza did not bring a section 609 claim, the court found that

even if he had, no cause of action would have existed under that provision.

The plaintiff argued that the word "discipline" in section 101(a)(5) has a different meaning than the one it has in section 609. The court found *Finnegan* dispositive of this argument. In a footnote, the *Finnegan* Court observed that though the purposes of sections 101(a)(5) and 609 are different—the former is limited to Title I rights only—the "discipline" terms should be construed similarly:

> [W]e are hard pressed to discern any ... distinction [between the meaning of the words] from either the language or the legislative history of the Act. Certainly one would expect that if Congress had intended identical language to have substantially different meanings in different sections of the same enactment it would have manifested its intention in some concrete fashion.

456 U.S. at 438 n. 9, 102 S.Ct. at 1872 n. 9. Based on the foregoing, this court found no distinction between the meaning of "discipline" in sections 101(a)(5) and 609, and ruled that because Franza was not disciplined under section 609, he was not disciplined under section 101(a)(5), either.

their rights of free expression ... and their jobs' [citation omitted.]

*Id.* at 440, 102 S.Ct. at 1872 (emphasis in original). The Court maintained that the LMRDA "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." *Id.* at 441, 102 S.Ct. at 1873. Moreover, according to the Court, exercise of this freedom furthers the Act's "overriding objective" of union democracy because "the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election." *Id.*

Somewhat complicating the *Finnegan* Court's section 102 analysis was its reference to the second circuit case of *Schonfeld v. Penza,* 477 F.2d 899 (2d Cir.1973). In *Schonfeld,* the court of appeals affirmed the issuance of a preliminary injunction prohibiting a union from removing a union official from elective office and declaring him ineligible for five years. The second circuit acknowledged that Title I protects the union-member relationship, not the union-employee or union-official relationship, *id.* at 904, yet found jurisdiction under Title I because the treatment of the deposed official "constitute[d] a form of intimidation of the membership ... and amount[ed] to reprisal for efforts by Schonfeld and others to advocate and implement changes in union structure and procedures," *id.* at 903. According to the *Schonfeld* court, initial intervention in union affairs by federal courts should be limited to those instances where "union action ... can be fairly said, as a result of established union history or articulated policy, to be *part of a purposeful and deliberate attempt by union officials to suppress dissent within the union." Id.* at 904 (emphasis added). In quoting that portion of *Schonfeld* emphasized above, the *Finnegan* Court appeared to recognize an exception to its holding that the membership rights of appointed union officials are affected only indirectly when such officials are discharged from union employment.

In summary, the *Finnegan* Court found that "discipline" under section 609 occurs only when a union member's rights or status as a member of the union are impinged. Furthermore, "infringement" under section 102 does not occur when appointed, policymaking union employees are discharged by a newly-elected union leader. Such discharges are only "indirect interference[s]" with membership rights unless part of a purposeful and deliberate attempt to suppress union dissent, as found in *Schonfeld.* The Court left open the question whether it would reach the same result under section 102 in a case where "nonpolicymaking and nonconfidential [union] employees" were dismissed by a new union leader. *Id.* n. 11. The court also did not address the situation where a union leader, like Thomas Robidoux, plays a role in having a union member discharged from non-union employment.

The defendants rely on the second circuit case of *Cotter v. Owens,* 753 F.2d 223 (2d Cir.1985), to bolster their argument that to succeed on any Title I claim a plaintiff must show a direct infringement of membership rights. Defendants' Memorandum of Law with Respect to LMRDA Section 102 at 4–8. The plaintiff in *Cotter* was appointed by the union's business manager to a safety committee created by the same official. The committee was not a formal part of the union structure and was not governed by the union's by-laws. It existed to monitor potential safety abuses, to disseminate information, and to suggest safety improvements. *Id.* at 224. After the plaintiff became active in a dissident movement within the local, he was removed from the committee by the union official who had appointed him. The plaintiff filed suit under section 102, alleging that he was dismissed in retaliation for his dissident views. *Id.* at 225. The trial judge found that the plaintiff was a policymaker and that his removal was thus excluded from Title I protection under *Finnegan. Id.* at 225–26. The court of appeals affirmed, finding that the union had "a legitimate interest in insuring that [the committee] reflects the policies of the present leadership." *Id.* at 228.

The defendants emphasize the following language in *Cotter* for the argument that no cause of action lies for Franza under section 102:

> *Finnegan* severely circumscribed the bounds of judicial intervention in intra-union factional disputes *by limiting Title I claims to cases directly affecting membership rights.* A member's effort to be part of the union hierarchy may implicate those rights indirectly, but it is not a Title I protected activity *under most circumstances.*

*Id.* (emphases added). According to *Cotter*, therefore, the *sine qua non* of most Title I violations—whether brought under section 609 or section 102—is that a member's rights as a member must be infringed. There is no dispute that Franza was able to attend union meetings after his discharge from the Plan, to speak out on union affairs, and, in general, to exercise all of the rights guaranteed him under sections 101(a)(1) and 101(a)(2) of the LMRDA. The defendants argue that the plaintiff's failure to establish any direct interference with membership rights, or the existence of a *Schonfeld* exception, precludes Franza's section 102 claim.

The plaintiff counters the *Cotter* case with one from the fifth circuit, *Miller v. Holden,* 535 F.2d 912 (5th Cir.1976). *Miller,* more than any other case cited by the parties or located by the court, has facts similar to those in the instant proceeding. *Miller* alleged that he was terminated from his position as training coordinator for his union's education trust because he supported the losing candidate in a union election. He sued the trust, the union, and the various trustees he believed had succumbed to union pressure to discharge him. *Id.* at 913. The complaint asserted violations of the National Labor Relations Act ("NLRA"), 29 U.S.C. Section 151 *et seq.,* and Title I of the LMRDA. *Id.* The district court found that the trust was "an independent entity," and the court of appeals stated that the trust had "a substantial and separate existence from the union." *Id.* at 914. The district court dismissed the complaint for lack of jurisdiction after conducting a preliminary injunction hearing. *Id.* at 913.

On appeal, *Miller* abandoned his claims against the individual trustees, and the court of appeals affirmed the lower court's dismissal of the claims against the trust. *Id.* at 914. As to the plaintiff's LMRDA claims against the union, the court first found that Miller's complaint failed to state a claim under section 609 because there was no allegation "that plaintiff's union membership has been impaired or that his employment is in any way connected to any status within the union." *Id.* at 915. Furthermore, "the parties agree that the plaintiff remained a member in good standing after his discharge and that union membership was so unrelated to the position of Training Coordinator for the Trust that it was not a prerequisite for the job." *Id.* n. 8. The court then turned to section 102, stating, "We do not believe that section [102] jurisdiction is limited to cases in which the union member is disciplined or punished in his capacity *as a member.* By its terms, this section provides jurisdiction to redress *any* union action which infringes the rights protected by Title I." *Id.* at 915–16 (emphases added). And, even more explicitly, section 102 provides "a remedy for retaliation against a member's exercise of free speech *even if he is not punished in his capacity as a member." Id.* at 917 (emphasis added). The court of appeals thus found that the district court was in error when it concluded that it had no section 102 jurisdiction over the plaintiff's LMRDA claims.

Franza argues that this court should be persuaded by the *Miller* court's holding that section 102 violations can occur even when union membership rights are not impinged. *Miller,* however, lacks strong persuasive value for two reasons.[6] First, it is

---

**6.** Also of note is that the *Miller* court expressly declined to comment on the merits of the plaintiff's claims; it remanded to the district court for such findings. *Miller v. Holden,* 535 F.2d 912, 916 (5th Cir.1976). After remand, the parties entered into a stipulation of facts, and the defendant union moved for summary judgment. *Miller v. Holden,* 95 L.R.R.M. (BNA) 2156 (M.D.

a pre-*Finnegan* case and as such is limited by the *Finnegan* Court's observations on the scope of section 102 claims. Second, *Miller* has been weakened in its own circuit by the post-*Finnegan* case of *Adams–Lundy v. Association of Professional Flight Attendants*, 731 F.2d 1154 (5th Cir.1984) ("*Adams–Lundy I*"). The *Adams–Lundy I* court found that

> *Miller* should not be read to suggest that any removal from union office stemming from the exercise of section 101 rights will give rise to a claim under section 102. Patronage, after all, is precisely a system of rewards and punishments dependent on an individual's votes and views. Thus, under ordinary circumstances, the shuffling of positions caused by political in-fighting or factionalism within a union implicates no rights safeguarded by the LMRDA.

*Id.* at 1158. The *Adams–Lundy I* court recognized the *Schonfeld* exception in *Finnegan* and also found that "*Miller* must be read in light of *Schonfeld.*" *Id.*

 In light of the lessons of *Finnegan, Cotter, Schonfeld,* and *Adams–Lundy I*, it seems apparent that a plaintiff seeking to prevail on a Title I claim must establish *prima facie* either the denial of a basic union membership right or the existence of a purposeful and deliberate scheme to subvert a union's democratic structure. *Accord Lynn v. Sheet Metal Workers' International Association*, 804 F.2d 1472, 1478 (9th Cir.1986) (cause of action under section 101 lies only for acts violating membership rights, not for those infringing upon rights acquired as an officer or employee; *Schonfeld* exception also available). After his discharge from Plan employment, the plaintiff clearly retained his section 101 rights. He could attend membership meetings and participate and vote in such proceedings; he also retained the right to express his views on union matters —including the right to criticize Thomas Robidoux for his part in the dismissal—and to campaign for candidates of his choice. In short, Franza's union membership status, rights, and privileges remained unchanged as a result of his discharge from the auditor position with the Plan. In addition, because the plaintiff had alleged the existence of a scheme to suppress dissent within Local 671, the court submitted a series of special interrogatories to the jury on the *Schonfeld* issue; all of these interrogatories were answered in the negative.[7] Thus, in the absence of a showing that he was prohibited from participating in union affairs or that he was the target of a plan to stifle dissent, the plaintiff has failed to establish a cognizable Title I claim.

In enacting the LMRDA, Congress clearly intended that courts refrain from intervening in the internal affairs of labor unions, except when such affairs have a fundamental impact on union democracy. *Finnegan*, 456 U.S. at 441–42, 102 S.Ct. at 1873–74. *See also* S.Rep. No. 187, 86th Cong. 1st Sess., *reprinted in* 1959 U.S. Code Cong. & Ad.News 2318, 2323. The

---

La.1977). In granting the defendant's motion, the district court found that

> [a]t the time of plaintiff's termination as Training Coordinator for the Trust, which termination forms the basis for his complaint, he was a member in good standing of [the union]. He is still a member in good standing of that union and his membership and activities within the union have in no way been impaired, altered or affected as a result of his termination....

*Id.* at 2157. The court also found "evidence of union politics at work, but there is not, and there should not, by [sic; be] any prohibition against that." *Id.* at 2158 (citations omitted).

**7.** Special Interrogatories Nos. 3 through 6 addressed the *Schonfeld* issue. Interrogatories Nos. 3 and 5 were directed at the defendant Thomas Robidoux, and Nos. 4 and 6 at the defendant Union. In addition, Interrogatories 3 and 4 posed the question whether the plaintiff had met his burden of proving a scheme to stifle dissent by "clear and convincing evidence;" Interrogatories 5 and 6 set the plaintiff's burden at "preponderance of the evidence." The court asked the questions on burden of proof in the alternative because the parties were in disagreement as to the burden required in this circuit. The defendants argued during trial that a clear and convincing standard is required under *Newman v. Local 1101, CWA*, 570 F.2d 439, 445–46 (2d Cir.1978) ("*Newman I*"). The plaintiff argued that the more easily satisfied preponderance standard is all that is required. Because the jury found that no scheme existed under either standard, this court need not resolve the issue at this time.

record is clear that no fundamental impact is present in this case: The plaintiff remained free after his discharge to criticize openly the union's leadership and its policies without fear of reprisal. It is entirely possible that Franza's termination was the result of a patronage system at work or a consequence of intra-union factionalism, but the action the plaintiff complains of was not intended to be prohibited by the LMRDA. A dismissal of the sort suffered by the plaintiff may be actionable under some other federal statute,[8] but it is not an "infringement" within the meaning of section 102 of the basic rights of membership protected by Title I.

## CONCLUSION

For the foregoing reasons, the court finds, as a matter of law, that the plaintiff's dismissal is not cognizable under the LMRDA and enters judgment in favor of the defendants.

---

8. Before he filed this suit on June 10, 1986, Franza had filed unfair labor charges with the National Labor Relations Board ("NLRB") alleging that Thomas Robidoux and Local 671 had violated certain provisions of the National Labor Relations Act ("NLRA") when they had him dismissed from Plan employment. Retaliation against union members for participation in intra-union politics is actionable under section 8(b)(1)(A) of the NLRA, 29 U.S.C. Section 158(b)(1)(A). After investigation, the regional NLRB officer found no merit to Franza's charges; this finding was affirmed by the NLRB's Office of the General Counsel on September 30, 1986.